No. 25-1752

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

LONDON LUXURY LLC,

*Appellee*,

v.

WALMART INC.,

*Appellant*.

On Appeal from the United States District Court
for the Western District of Arkansas
No. 5:22-CV-05059-TLB

## BRIEF OF APPELLEE

Scott Richardson
MCDANIEL WOLFF, PLLC
1307 West 4th Street
Little Rock, AR 72201
501-954-8000
scott@mcdanielwolff.com

Brendon DeMay (*Counsel of Record*)
Priyanka Timblo
Ian Miller
Brett Donaldson
HOLWELL SHUSTER &
  GOLDBERG LLP
425 Lexington Avenue, 14th Fl.
New York, NY 10017
646-837-5151
bdemay@hsgllp.com
ptimblo@hsgllp.com
imiller@hsgllp.com
bdonaldson@hsgllp.com

*Counsel for London Luxury LLC*

September 8, 2025

# SUMMARY OF THE CASE

During the COVID-19 pandemic, Walmart unambiguously "committed" to purchase 7 billion blue nitrile gloves from London Luxury "on a noncancellable and irrevocable basis." As the plain text of the agreement states, and as all parties understood, Walmart was bound to a minimum-purchase commitment. Walmart planned to resell the gloves to a wholesaler for quick profit, but Walmart's buyer later backed out. Walmart then repudiated and searched for pretextual excuses to escape liability for breaching its commitment. The jury rejected them all, finding that Walmart breached the contract and that London Luxury did not.

On appeal, Walmart argues that a tangential reference in the contract to boilerplate default terms voids the specifically negotiated "noncancellable and irrevocable" commitment. This Court already rejected exactly that argument in another case involving Walmart's boilerplate. Walmart also argues that Walmart could terminate its obligations for even an immaterial breach of the boilerplate. That argument is waived, contravenes Arkansas law, is not a reasonable construction of the contract, and in any event would require overturning the jury's finding of no breach at all. Finally, Walmart argues the district court should not have awarded prejudgment interest, but interest was proper because damages were based on unrebutted calculations and undisputed evidence. The judgment should be affirmed. London Luxury requests 20 minutes of oral argument.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eighth Circuit Rule 26.1A, Appellee London Luxury LLC hereby discloses that it has no parent company and that no publicly held corporation owns ten percent (10%) or more of its stock.

# TABLE OF CONTENTS

STATEMENT OF ISSUES ...................................................................1

INTRODUCTION ...........................................................................2

STATEMENT OF THE CASE............................................................4

    A.   Walmart Buys Gloves from London Luxury to Resell to a Wholesaler ...........................................................................4

    B.   Walmart Makes the Deal "Noncancellable and Irrevocable" to Secure Financing............................................................................7

    C.   London Luxury Performs........................................................11

    D.   Walmart Repudiates its Commitment .....................................11

    E.   London Luxury Sues...............................................................13

    F.   Walmart Undermines its Positions on Appeal .......................14

    G.   The District Court Grants Partial Summary Judgment...........14

    H.   The Jury Hears the Evidence .................................................15

    I.   The District Court Hears Rule 50(a) Motions and Reaffirms the Summary-Judgment Ruling .................................................15

    J.   The Arkansas Jury Finds for London Luxury.........................16

SUMMARY OF THE ARGUMENT ....................................................18

ARGUMENT .................................................................................19

   I.   Walmart's "No Business Expectation" Argument Fails. ...............19

    A.   The District Court Properly Concluded That the Parties' Agreement Included a Minimum-Purchase Commitment......................20

        1.   The Plain Meaning of the "Noncancellable and Irrevocable" "Commit[ment] to Purchase" a "Minimum" Quantity Is That Walmart Is Bound to a Minimum Purchase.....................20

        2.   Walmart's Interpretation Nullifies the Language That Made the Transaction Possible ........................................................22

        3.   The Minimum-Purchase Commitment Harmonizes with All Other Provisions, Without Any Necessary Conflict ...................24

    B.   Walmart's Authorities Support London Luxury .....................................30

    C.   The Side Letter Reaffirmed the Purchase Commitment........................32

    D.   The Extrinsic Evidence Unequivocally Proves Walmart Intended to Be Bound to a Minimum-Purchase Commitment ................................33

II.  Walmart's "Express Termination Clause" Argument Fails ..........................36

    A.   Walmart Invited the "Error" It Now Asserts..........................................36

    B.   Under Arkansas Law, Breaches Must Be Material................................38

    C.   The "Noncancellable and Irrevocable" Agreement Does Not Allow for Termination for Immaterial Breaches .............................................43

        1.   The Plain Meaning of "Noncancellable and Irrevocable" Does Not Permit Termination for Immaterial Breaches ...........................44

        2.   The Termination Clause Does Not Expressly Permit Termination for Immaterial Breach.....................................................................45

        3.   The District Court Correctly Harmonized the Supposedly Conflicting Provisions .........................................................................45

    D.   Walmart Lost Any Asserted Reserved Right to Terminate Through Prior Repudiation ...................................................................................47

    E.   Walmart Cannot Overturn the Jury's Verdict of No Breach .................49

        1.   Rule 50 Requires Extreme Deference to the Verdict.......................49

        2.   Walmart Argued at Trial the "Whole Case Hangs on Credibility"..49

        3.   The Fact Determination at Issue Is Inherently Subjective and Required Applying the Jurors' "Common Knowledge" as the "Voice of the Community"..............................................................51

        4.   Substantial Evidence Supports the Jury's Verdict ..........................52

        5.   Walmart's Remaining Arguments Are Meritless ............................55

III. Alternatively, London Luxury Should Prevail on Reformation ....................56

IV. The District Court Correctly Awarded Prejudgment Interest .......................58

CONCLUSION ..................................................................................................61

**TABLE OF AUTHORITIES**

## Cases

*Advance Constr. Co. v. Dunn*,
   563 S.W.2d 888 (Ark. 1978)..............................................................1, 60

*Affordable Care, LLC v. JNM Off. Prop., LLC*,
   2024 WL 1234928 (5th Cir. Mar. 22, 2024)................................ 44, 45

*All-Ways Logistics, Inc. v. USA Truck, Inc.*,
   583 F.3d 511 (8th Cir. 2009)...................................................................57

*Bank of Mulberry v. Fireman's Fund Ins. Co.*,
   720 F.2d 501 (8th Cir. 1983)......................................................... 59, 60

*Bank of Newport v. First Nat'l Bank & Trust Co. of Bismarck*,
   687 F.2d 1257 (8th Cir. 1982)................................................................33

*Boellner v. Clinical Study Centers, LLC*,
   378 S.W.3d 745 (Ark. 2011).......................................................... 41, 42

*Cent. Baptist Church of Albany, Georgia, Inc. v. Church Mut. Ins. Co.*,
   2025 WL 2026797 (11th Cir. July 21, 2025).......................................36

*Children's Broad. Corp. v. Walt Disney Co.*,
   357 F.3d 860 (8th Cir. 2004)...................................................................58

*Continental Carbonic Prods., Inc. v. Cohen*,
   241 S.W.3d 296 (Ark. Ct. App. 2006) ...................................... 1, 39, 40

*Diesel Mach., Inc. v. B.R. Lee Indus., Inc.*,
   418 F.3d 820 (8th Cir. 2005)...................................................................49

*Dorsett v. Buffington*,
   429 S.W.3d 225 (Ark. 2013)...................................................................60

*Driver v. Wood*,
   670 F. Supp. 3d 723 (W.D. Ark. 2023)..................................................57

*Drut Techs., Inc. v. Microsoft Corp.*,
    2022 WL 2156962 (W.D. Wash. June 15, 2022)...................................44

*Ferrell v. W. Bend Mut. Ins. Co.*,
    393 F.3d 786 (8th Cir. 2005)..................................................................58

*First State Bank of Floodwood v. Jubie*,
    86 F.3d 755 (8th Cir. 1996)....................................................................56

*Gunn v. Farmers Ins. Exch.*,
    372 S.W.3d 346 (Ark. 2010)..................................................................42

*Internaves de Mexico s.a. de C.V. v. Andromeda Steamship Corp.*,
    898 F.3d 1087 (11th Cir. 2018)..............................................................31

*K7 Design Grp., Inc. v. Walmart, Inc.*,
    143 F.4th 931 (8th Cir. 2025) ........................................................ *passim*

*Leonard v. Merchants & Farmers Bank*,
    720 S.W.2d 908 (Ark. 1986)..................................................................20

*Lockard v. Missouri Pac. R.R.*,
    894 F.2d 299 (8th Cir. 1990)..................................................................56

*Loomis v. Loomis*,
    221 Ark. 743 (1953)...............................................................................61

*Matter of Provider Meds, LLC*,
    907 F.3d 845 (5th Cir. 2018)..................................................................44

*Ozarks Unlimited Res. Coop., Inc. v. Daniels*,
    969 S.W.2d 169 (Ark. 1998)..................................................................59

*Rains v. Jones*,
    905 F.3d 545 (8th Cir. 2018)........................................... 20, 22, 28, 46

*Ralston Purina Co. v. Parsons Feed & Farm Supply, Inc.*,
    364 F.2d 57 (8th Cir. 1966)....................................................................49

*Randall Ford, Inc. v. Randall,*
635 S.W.3d 507 (Ark. Ct. App. 2021) ....................................................32

*Ray Bell Constr. Co. v. Dep't of Transp.,*
356 S.W.3d 384 (Tenn. 2011) ..............................................................32

*Reesnes v. Reesnes,*
655 S.W.3d 722 (Ark. Ct. App. 2022) ...................................................61

*Reeves v. Sanderson Plumbing Prods., Inc.,*
530 U.S. 133 (2000) ..................................................................... 52, 54

*Reuter v. Jax Ltd.,*
711 F.3d 918 (8th Cir. 2013).......................................................... 42, 43

*Reynolds Health Care Servs., Inc. v. HMNH, Inc.,*
217 S.W.3d 797 (Ark. 2005)..................................................................58

*Roye Realty & Developing, Inc. v. Arkla, Inc.,*
78 F.3d 597 (10th Cir. 1996)................................................................47

*RW Power Partners, LP v. Virginia Elec. & Power Co.,*
899 F. Supp. 1490 (E.D. Va. 1995)................................................. 43, 45

*Security Benefit Life Ins. Co. v. Military Assocs.,*
1992 WL 93275 (Ark. Ct. App. Apr. 22, 1992)....................................31

*Smith v. Arrington Oil & Gas, Inc.,*
664 F.3d 1208 (8th Cir. 2012)................................................. 20, 21, 22

*Smith v. S. Farm Bur. Cas. Ins. Co.,*
114 S.W.3d 205 (Ark. 2003)......................................................... 24, 45

*Starks v. Rent-A-Ctr.,*
58 F.3d 358 (8th Cir. 1995)..................................................................36

*Thornton Drilling v. Nat'l Union Fire Ins. Co.*,
    537 F.3d 943 (8th Cir. 2008)................................................................. 1, 27, 30, 46

*TXO Prod. Corp. v. Page Farms, Inc.*,
    698 S.W.2d 791 (1985)....................................................................... 1, 39, 40, 41

*Union National Bank of Little Rock v. Federal National Mortgage Assoc.*,
    860 F.2d 847 (8th Cir. 1988)...................................................................................42

*Vereen v. Hargrove*,
    96 S.W.3d 762 (Ark. Ct. App. 2003) ...................................................................40

*Wal-Mart Stores, Inc. v. Coughlin*,
    255 S.W.3d 424 (Ark. 2007)........................................................................ 20, 22

## Other Authorities

13 *Corbin on Contracts* § 68.9 (2023)....................................................................47

Ark. Model Jury Instr. 2427 Notes.........................................................................37

# STATEMENT OF ISSUES

1.  Whether Walmart made a minimum-purchase commitment. *K7 Design Grp., Inc. v. Walmart, Inc.*, 143 F.4th 931 (8th Cir. 2025); *Thornton Drilling v. Nat'l Union Fire Ins. Co.*, 537 F.3d 943 (8th Cir. 2008).

2.  Whether Walmart could terminate its commitment for *immaterial* breach, and whether the jury's finding of no breach must be overturned. *Thornton*, 537 F.3d 943; *TXO Prod. Corp. v. Page Farms, Inc.*, 698 S.W.2d 791 (1985); *Continental Carbonic Prods., Inc. v. Cohen*, 241 S.W.3d 296 (Ark. Ct. App. 2006).

3.  Whether the court properly awarded prejudgment interest. *Advance Constr. Co. v. Dunn*, 563 S.W.2d 888 (Ark. 1978).

**INTRODUCTION**

Walmart wanted to secure billions of nitrile gloves during the COVID-19 pandemic. Walmart executives made a big bet they could resell the gloves to a wholesaler. Walmart executives saw huge upside: "$500M here we come!"

But Walmart was told that banks and overseas factories would not agree to Walmart's order without a rock-solid assurance that the deal was noncancellable. So Walmart's senior buyers and in-house lawyers agreed to a contract unambiguously providing for a "noncancellable and irrevocable" "commit[ment] to purchase" billions of gloves from London Luxury.

Later, demand for gloves fell, and Walmart's own customer backed out. That meant Walmart had a "noncancellable and irrevocable" commitment to buy billions of gloves, and no customer. At no point did Walmart believe it had no minimum-purchase commitment and could cancel at any time. Instead, Walmart's own lawyers repeatedly advised that Walmart was "*on the hook*." So Walmart then tried to generate pretexts for terminating its commitment.

After a two-week trial, the jury found that Walmart materially breached the contract, that London Luxury did not breach the contract at all, and that the contract was authorized. The verdict was unanimous.

Walmart's primary argument on appeal is that the "noncancellable and irrevocable" "commit[ment] to purchase" was a nullity the moment it was signed.

Walmart's interpretation ignores the plain meaning of the parties' agreement and gives literally no effect to the core term that made the agreement possible in the first place. And this Court recently rejected Walmart's effort to weaponize its boilerplate "no-business-expectation" clause to nullify its commitments, holding that the boilerplate bars a supplier's suit only if it is based on general "projections or representations about quantities to be purchased." *K7 Design Grp., Inc. v. Walmart, Inc.*, 143 F.4th 931, 938 (8th Cir. 2025). The boilerplate does not apply where, as here, Walmart made a discrete and specific "commitment." *Id.*

Walmart's backup argument is that another boilerplate clause, this one permitting termination in certain circumstances, allowed it to cancel its "noncancellable and irrevocable" $500 million commitment for any *immaterial* breach. But Walmart affirmatively requested the very jury instruction it now contests: "A breach that is not material does not excuse the performance of the other party[.]" Putting aside that Walmart cannot appeal a supposed "error" it invited, Walmart's argument is meritless. First, Arkansas law states that only a material breach, not an immaterial breach, will excuse performance, even when the contract allows termination upon breach. Second, even under the non-Arkansas authorities Walmart cites, a termination clause must contain an explicit statement that an *im*material breach allows termination, and the clause here does not contain the required clear statement, as several courts have held. That conclusion is

3

especially clear here, where Walmart's commitment is "noncancellable and irrevocable."  Finally, were all that not enough, Walmart's argument requires overturning the jury's specific verdict that London Luxury *did not breach the contract at all, materially or otherwise*.  Substantial evidence supports that verdict, and it is grounded in factual and credibility determinations that are unreviewable on appeal.

Walmart's brief attempts to distract from the legal issues with a lengthy and irrelevant story about its former employee Garrett Small.  In doing so, Walmart improperly construes the evidence in the light most favorable to *Walmart* and improperly draws credibility determinations in favor of *Walmart*.  And in their haste to make him their scapegoat, Walmart ignores the undisputed evidence that Garrett Small repeatedly acted in Walmart's best interests and worked tirelessly to realize the profits his bosses wanted.

Walmart wanted the deal to be "noncancellable and irrevocable."  That's what it got.  The jury and judge in Walmart's hand-picked, hometown forum rejected Walmart's attempts to escape its commitments.  This Court should too.

## STATEMENT OF THE CASE

### A. Walmart Buys Gloves from London Luxury to Resell to a Wholesaler

In 2020, the world grappled with the COVID-19 pandemic.  To secure nitrile gloves, Walmart turned to London Luxury given its "record of excellence as a

4

current WM supplier as a recent recipient of [the] Innovative Supplier Award by Walmart." LL.App.0241.[1] Over time, the parties entered into an agreement comprised of several interrelated documents.

In July 2020, Walmart gave London Luxury an award letter to supply three million boxes of gloves per month. LL.App.0243. London Luxury also signed Walmart's boilerplate, standard-form, nonnegotiated Supplier Agreement. WM.App.0228, 0235, R.Doc.140-4.at.2, 9. The boilerplate includes a paragraph with the header "No Business Expectation" and says: "Projections, past purchasing history and representations about quantities to be purchased are not binding on" Walmart, and Walmart "has no obligation and makes no promises to purchase any minimum amount of Merchandise." WM.App.0235, R.Doc.140-4.at.9. The award letter included similar language. LL.App.0244. Later in 2020, when Walmart considered buying fewer quantities, Greg Dow, a senior attorney in Walmart's Legal Department, wrote: "Now two of the departments want to shrink their portion of the *purchase commitment*.[2] I made it clear we need to standby [sic] our

---

[1] London Luxury cites Walmart's appendix as "WM.App.__," London Luxury's appendix as "LL.App.__," Walmart's addendum as "WM.Add.__," Walmart's brief as "WM.Br.__," and district court docket entries as "R.Doc.__.at.__." Appendix citations without any "R.Doc." citation refer to trial exhibits or materials Walmart emailed to the district court.

[2] Emphases are added unless specified.

*commitment*." Trial.Tr.1977:15-1977:18.[3]  He opined that Walmart was "*on the hook* for 3 million boxes of gloves per month."  LL.App.0033, R.Doc.258-14.at.2. Walmart's lawyer reached that conclusion even though the agreement did not— yet—say the agreement was "noncancellable and irrevocable," and even though the supplier agreement and award letter both contained no-business-expectation clauses.

Then Walmart executives made a big bet.  They decided to nearly *double* Walmart's order from London Luxury.  They did so because Walmart wanted to break into business-to-business sales, or B2B.  So Walmart decided to buy gloves from London Luxury and then resell them to a fly-by-night wholesaler named Heypex that was in debt to Walmart for millions of dollars.  Trial.Tr.401:12-24, 525:7-526:21.  In February 2021, Walmart signed a contract to sell Heypex 5.5 *billion* gloves, far more than Walmart had committed to purchase from London Luxury.  LL.App.0042, R.Doc.258-27.at.2.  Walmart had little experience with B2B but wanted to compete with Amazon in the B2B space. Trial.Tr.538:6-25,

---

[3] For several reasons, including because Walmart called an in-house lawyer as a fact witness, Walmart waived privilege over many documents showing that Walmart's lawyers knew Walmart was bound to a commitment, that Walmart's witnesses lied to blame Small, and that Walmart's reasons for terminating were pretexts.  LL.App.0097, R.Doc.398; LL.App.0106, R.Doc.405; LL.App.0114, R.Doc.408; LL.App.0121, R.Doc.413; LL.App.0129, R.Doc.414; LL.App.0139, R.Doc.429; LL.App.0152, R.Doc.431; LL.App.0170, R.Doc.434; LL.App.0173, R.Doc.442; LL.App.0176, R.Doc.444.

541:3-23.  And Walmart executives were excited by potentially huge profits in buying billions of gloves from London Luxury to flip at a markup: they calculated the deal's value as "$479M in Sales" and "$72M in Profit."  LL.App.0039, R.Doc.258-26.at.5.  As Shannon Allen, Walmart's key buyer, put it giddily: "$500M here we come!"  LL.App.0036, R.Doc.258-26.at.2.

## B. Walmart Makes the Deal "Noncancellable and Irrevocable" to Secure Financing

There was a problem.  To provide financing necessary for the factories to fulfill Walmart's gargantuan order, the *bank* behind the deal (TD Bank, London Luxury's bank) "***had to be absolutely comfortable that this contract was noncancellable***" to make sure the bank wouldn't be left holding the bag. Trial.Tr.200:18-23, 204:19-206:23, 958:4-11.  If Walmart could cancel, the bank would walk away, meaning "there would be no glove contract," and Walmart would get no gloves, no $500 million in revenue, and no $72 million in profit. Trial.Tr.204:4-25.

London Luxury's CFO conveyed the bank's request to Walmart. Trial.Tr.204:2-12.  Walmart did not bristle; instead, Shannon Allen asked Small (in Walmart Global Sourcing) to confirm exactly what the bank needed to get it done. Trial.Tr.1700:15-1701:5.  Small "was in charge of all PPE sourcing" and had authority to negotiate on Walmart's behalf.  Trial.Tr.1886:23-1887:13.  Small wrote to London Luxury: "There have been multiple emails and letters stating that

Walmart is taking 12 months of the supply you have secured. *This is legal and binding even though it is via email. We are buying 52 weeks no matter what.* Even with the above is the bank not accepting? I need to know exactly what the bank needs and that may mean some push back on the bank given the above clearly noted *legally binding agreements made*." LL.App.0184-85, R.Doc.498-1.at.66-67.

Given the bank's request, London Luxury proposed "a simple 'truly binding' letter, 'confirming the 12 month committed quantity is unconditional, and won't be canceled.'" LL.App.0207, R.Doc.498-2.at.81. Small emailed Allen and Walmart in-house lawyer, Vicki Vasser-Jenkins: "Vicki … can we put together a letter stating *12-month committed quantity is **unconditional, and won't be cancel***?" *Id.* Vasser responded: "this ***purchase commitment*** ties directly to the Heypex contract we just executed, right?" LL.App.0217, R.Doc.498-2.at.101.

Shortly thereafter, Small and Marc Jason had lunch, meeting in person for the first time. Their testimony conflicted as to what was discussed. Trial.Tr.925:7-926:13, 1817:24-1818:4. But one key point is undisputed: Small testified that *nothing* at that lunch "enticed [him] to violate [his] responsibilities as a Walmart employee" regarding the glove deal. Trial.Tr.1708:22-1709:5.

Later, London Luxury again proposed specific language stating Walmart's commitment was "noncancellable and irrevocable"; Small sent it to Vasser and then another Walmart lawyer (Mike Allen) for legal review. Trial.Tr.1709:7-

1714:2, 1884:23-1886:15 (adding a third lawyer). Vasser approved it. Trial.Tr.1713:11-1715:2 ("noncancellable and irrevocable"), 1860:2-9.

Vasser agreed Small should "amend the original [July 2020] award letter" to provide for a "committed quantity" that is "unconditional and won't be canceled." Trial.Tr.1701:14-1706:12. Vasser did not contemporaneously interpret the boilerplate as making her approval of the "noncancellable and irrevocable" term a nullity. Small made minor corrections to the agreement to implement the directive that the commitment be truly noncancellable, including removing the irrelevant no-business-expectation clause from the earlier award letter. Trial.Tr.1860:2-1861:17. Although Walmart argued at trial those changes vitiated the lawyers' earlier approval, two Walmart lawyers—Vasser and Dow—reviewed the edits after Walmart repudiated and did not believe the changes were material; Dow concluded yet again that Walmart was ***still "on the hook***." LL.App.0402-04, R.Doc.498-2.at.140-42; Trial.Tr.1906:4-1912:4, 1974:11-1975:14.

In short, Walmart agreed the deal would be noncancellable, so that is what it said. The final version (the "Commitment") states:

> ***Walmart is committed to purchase*** from London Luxury ***a minimum*** of 6,072,770 master cartons [6 billion gloves] of nitrile examination gloves (the "Product") ***on a non-cancellable and irrevocable basis*** for a minimum of a twelve (12) month period.

WM.App.0382, R.Doc.248-14.at.3, WM.Add.122.

Contrary to the implication in Walmart's brief, the Commitment does not include a blanket incorporation-by-reference of every term in Walmart's lengthy boilerplate. Instead, the reference to the boilerplate and conflicts appears in the paragraph after the "noncancellable and irrevocable" clause, and in the context of "insurance" and "regulatory requirements":

> **Agreement and Certificate of Insurance**
>
> Walmart's award of business to your company is contingent upon you (a) providing an updated certificate of insurance (if not current), and (b) meeting the other requirements described in this letter as well as any and all compliance and regulatory requirements associated with the Supplier Agreement. In the event of a conflict between the terms of this letter and the Supplier Agreement, the terms of the Supplier Agreement will control.

*Id.*

Shortly thereafter, Walmart decided to move London Luxury to Walmart's direct-import-supplier program, which allows Walmart to use its logistics expertise to lower costs by taking possession from the supplier at the foreign port. Trial.Tr.747:15-24. As a result, Walmart issued another boilerplate supplier agreement substantially similar to the earlier one. Trial.Tr.604:7-13.

The next month (April 2021), Walmart reaffirmed its commitment through a side letter and a letter of credit, and *increased its order again* to 7.2 billion gloves (72 million boxes, or 7.2 million cartons). The side letter "irrevocably confirm[s]" that "every 60 days," "we will … renew" the letter of credit "until the exhaustion

of the **total contracted quantity of 7.200.000.000 pieces** [of] nitrile gloves placed

on order for a period of 12 months" (the "Side Letter").  LL.App.0054, R.Doc.259-

17.at.8.  Vasser explained she had "no objection to the 'side letter' language"

because "[i]t appears to be **a promise to a promise Walmart has already made**."

LL.App.0228, R.Doc.498-2.at.129; LL.App.0296 (Vasser: "pertained to a

**purchase commitment**").

### C. London Luxury Performs

London Luxury encountered difficulties sourcing gloves from overseas

during the pandemic.  Walmart was well-aware of the delays, however, and

because of its profitable Heypex deal and the "purchase commitment Walmart

gave LL," decided to "proceed with LL (despite delays)."  LL.App.0238,

R.Doc.498-2.at.139; Trial.Tr.585:7-587:25, 1923:5-16.

London Luxury overcame early challenges.  By September 2021, London

Luxury dropped the supplier that had caused delays, and instead secured new,

highly reliable factories; gloves began shipping frequently and in huge quantities.

Trial.Tr.379:5-380:13.

### D. Walmart Repudiates its Commitment

Then suddenly everything changed.  In October 2021, Walmart's customer

Heypex was broke and backed out of the deal after facing issues with its own end-

buyers.  Trial.Tr.781:22-782:1, 1015:6-14, 1767:6-1768:18; LL.App.0305.  As one

Walmart SVP wrote to her boss, one of the most senior executives at Walmart: "the B2B buyer cancelled the order."  LL.App.0239, R.Doc.498-2.at.171.[4]

Walmart executives were in a bind.  They had committed to buy billions of gloves but had no customer to sell them to.  Trial.Tr.394:22-395:18.  As the same SVP recounted, Walmart decided to back out of its deal: Walmart's "merchants *asked to unwind the production commitment*" with London Luxury. LL.App.0239, R.Doc.498-2.at.171.

Therefore, on October 22, Walmart directed London Luxury in writing to "stop all production" because Walmart was "continuing to have issues" with Heypex, and repeated its repudiation in a call that day.  Trial.Tr.274:13-14, 1015:6-7.

Walmart's own lawyers knew Walmart would be liable.  After the repudiation, Walmart's in-house lawyers Dow and Vasser discussed the "purchase commitment" again, and Dow reaffirmed his conclusion from months earlier that Walmart was "*on the hook*" for its glove commitment.  LL.App.0402-04, R.Doc.498-2.at.140-42; Trial.Tr.1769:4-23, 1905:5-1906:18.

---

[4] This document was not produced until midway through trial.  It revealed that earlier trial testimony from Walmart witnesses that the buyer never cancelled was a lie.  Trial.Tr.610:16-611:1, 734:5-21, 2350:8-19.

On November 11, Walmart sent a pretextual termination notice asserting issues including purported factory-sourcing and testing issues. LL.App.0293. It did not reference any no-business-expectation clause.

Walmart then furiously attempted to generate evidence for its pretexts. As Small explained: "Julie [Walmart's head buyer] wanted out … So then Walmart has to find a 'reason.'" LL.App.0196, R.Doc.498-1.at.138. (The jury heard the unrebutted testimony of Professor Robert Phalen—who literally wrote the book on glove testing and is one of the world's leading experts on nitrile gloves—that the gloves met the relevant quality standards and that purported concerns about testing were meritless. Trial.Tr.1530:4-20, 1559:19-1560:20.) Walmart's regulatory team was directed to find problems, even though they pushed back: "I'm honestly not sure why you guys started an investigation." Trial.Tr.1994:3-4. One employee wrote: "I was on a call yesterday with all the attys in the world … lets not waste everyone's time." LL.App.0202, R.Doc.498-1.at.202. The real reason: "We are all just pawns in an insane political game." Trial.Tr.1996:8-10.

### E. London Luxury Sues

London Luxury sued for breach of contract in January 2022. Walmart asserted counterclaims for breach of the parties' agreement, plus tort claims. During the early stages of the suit, Walmart uncovered what it argued was evidence that a June 2021 letter to buy Made-in-America gloves from a US-based factory

that Jason envisioned building (the "June Letter") had not been authorized by Walmart. London Luxury withdrew reliance on the June Letter after Small and his boss filed affidavits claiming it was never signed by anyone at Walmart. Small had, in fact, signed the June Letter, meaning his sworn affidavit was a lie. Small admitted at trial he "lied under oath in this lawsuit to help Walmart and to hurt London Luxury." Trial.Tr.1774:15-1775:25.

### F. Walmart Undermines its Positions on Appeal

Walmart never moved to dismiss. Not on the no-business-expectation clause, or any other issue. That is odd, if Walmart's primary argument on appeal is to be believed—that the boilerplate unambiguously nullifies the $500 million "noncancellable and irrevocable" commitment.

Nor did Walmart seek summary judgment on the no-business-expectation issue. After London Luxury sought summary judgment that Walmart *was* bound, Walmart argued (1) the last supplier agreement "superseded" the Commitment—an issue it abandons on appeal; and (2) the "conflict-resolution clause" meant the existence of a minimum-purchase commitment was a *jury question*, whereas now Walmart says it is unambiguous. LL.App.0063-65, 0074, R.Doc.278.at.9-11, 20.

### G. The District Court Grants Partial Summary Judgment

The district court held there was an unambiguous "noncancellable and irrevocable" minimum-purchase commitment, and in any event that "no reasonable

juror could believe otherwise." WM.App.0609, 0611, R.Doc.399.at.40, 42,

WM.Add.40, 42. The court dismissed London Luxury's pled-in-the-alternative

reformation claim as therefore moot. WM.App.0615, R.Doc.399.at.46,

WM.Add.46. The court also allowed Walmart to argue that alleged misconduct by

London Luxury "negated" Small's authority to sign the Commitment.

WM.App.0606-07, R.Doc.399.at.37-38, WM.Add.37-38.

### H. The Jury Hears the Evidence

Fourteen witnesses testified over two weeks. Walmart argued that a

purported breach of a conflict-of-interest provision allegedly incorporated into the

boilerplate (a) vitiated Small's "authority" to sign the Commitment, rendering it

unenforceable (Trial.Tr.2373:13-15); (b) wrongly induced the gloves deal,

therefore requiring $27 million in tort damages for gloves Walmart paid for,

asserting that without purported conflicts-of-interest, the "contract would never

have been done" and "[w]e would have never spent the $27 million"

(Trial.Tr.2413:6-2415:1); and (c) allowed Walmart to terminate the agreement and

justified damages (Trial.Tr.2376:5-19, 2415:1-8).

### I. The District Court Hears Rule 50(a) Motions and Reaffirms the Summary-Judgment Ruling

Both parties moved for judgment as a matter of law under Rule 50(a). The

district judge generally reserved decision, but he explained at length that "as the

trial evidence came in, the court is even more persuaded now than it was before" at

summary judgment that Walmart intended to be bound to a minimum-purchase commitment. Trial.Tr.2118:21-23. He concluded: "*I don't get a whole lot of opportunities to speak to the Eighth Circuit, but I'm speaking to them now*," because "there's just no way that Walmart can say out of one side of its mouth that the purchase agreement is noncancellable and irrevocable, and on the other side, say that it's not a commitment to purchase any minimum quantity." Trial.Tr.2121:5-10.

### J. The Arkansas Jury Finds for London Luxury

The jury verdict was unanimous. In separate interrogatories, the jury found:

- Small had the authority to bind Walmart through the Commitment and Side Letter, rejecting Walmart's conflict-of-interest arguments;

- Walmart breached its agreement with London Luxury;

- Walmart's breach-of-contract counterclaim for partial or full damages entirely failed, rejecting even a partial breach;

- London Luxury was owed expectation damages of $101,218,680;

- Small, aided by London Luxury, breached his duty to deal "fairly and honestly" with Walmart;

- Walmart was due $350,000 in tort damages (one year of Small's compensation);

- However, any tort did not induce Walmart's glove purchases, and therefore Walmart was due $0 on the gloves-damages interrogatory on its tort counterclaims.

WM.App.0676-0688, R.Doc.458.at.3-15.

Judge Brooks denied Walmart's post-trial motions. Regarding Walmart's argument that its nonperformance was excused by alleged breach of a Conflicts of Interest Policy, he "f[ound] that Walmart has broadly overstated the contextual application of the Conflicts of Interest Policy to the facts of *this* case." WM.App.0720, R.Doc.512.at.23, WM.Add.80 (emphasis in original). He found the meaning and scope of that clause "vague" and "not as definitive as Walmart paints it." *Id.* And although the court noted Walmart presented evidence supporting its theory of breach, "the evidence and reasonable inferences to be drawn from the evidence did not point exclusively in Walmart's favor." WM.App.0725, R.Doc.512.at.28, WM.Add.85.

Finally, Judge Brooks noted "the trial testimony that [Walmart] elected *not to terminate* its business relationship with London Luxury *even after* Walmart learned about" the June Letter. WM.App.0723, R.Doc.512.at.26, WM.Add.83 (emphasis in original) (quoting the undisputed testimony that Walmart continued to purchase from London Luxury millions of dollars of non-glove products for months). Therefore, "a jury could have reasonably concluded from the evidence" that Walmart's claimed "Standards violations" was just a pretext. WM.App.0726-27, R.Doc.512.at.29-30, WM.Add.86-87.

## SUMMARY OF THE ARGUMENT

**I.** The district court correctly held that the plain meaning of Walmart's "noncancellable and irrevocable" "commit[ment] to purchase" a "minimum" quantity of gloves is unambiguous, and Walmart's contrary interpretation is absurd. Walmart admits that the goal of its proposed interpretation is to nullify the core term of the specifically negotiated agreement that made the entire transaction possible. Walmart's commitment does not conflict with any boilerplate no-business-expectation clause, as this Court's precedents instruct, including a recent decision interpreting the no-business-expectation clause. The parties reaffirmed Walmart's commitment in the Side Letter. Even if the agreement were ambiguous, all extrinsic evidence supports London Luxury.

**II.** The district court correctly held Walmart could not terminate its commitment for immaterial breach. *First*, Walmart waived this argument by submitting a jury instruction stating that immaterial breaches do *not* justify nonperformance. *Second*, under Arkansas law, only a material breach excuses another party's nonperformance, even for contracts with a termination clause. *Third*, displacing the default rule that only prior material breaches excuse nonperformance requires a clear statement in the contract that immaterial breaches justify termination; no such statement exists here, and in fact the agreement is "noncancellable and irrevocable." *Fourth*, Walmart lost any purported termination

right when it repudiated its commitment. *Fifth*, the jury expressly found London Luxury did not breach the contract *at all*—materially or immaterially. Substantial evidence supports that verdict.

**III.** Alternatively, the Court should affirm by reforming the contract. There is no genuine dispute the parties intended to create a noncancellable and irrevocable commitment. Any inconsistency between that commitment and the boilerplate should be reformed to reflect the parties' intent.

**IV.** The district court correctly awarded prejudgment interest. Prejudgment interest is required under Arkansas law because the damages are based on math applied to undisputed evidence.

## ARGUMENT

### I. Walmart's "No Business Expectation" Argument Fails

Walmart's primary argument is that, although the Commitment expressly says "Walmart is committed to purchase from London Luxury a minimum [quantity] of … gloves" on "a noncancellable and irrevocable basis," WM.App.0382, R.Doc.248-14.at.3, WM.Add.122, the *same agreement* renders that commitment a nullity by incorporating by reference a long boilerplate termsheet containing a "no-business-expectation" clause. Walmart's argument disregards the plain language of the Commitment, contravenes this Court's recent decision in *K7*, and renders the centerpiece of the contract a nullity.

## A. The District Court Properly Concluded the Agreement Included a Minimum-Purchase Commitment

### 1. The Plain Meaning of the "Noncancellable and Irrevocable" "Commit[ment] to Purchase" a "Minimum" Quantity Is That Walmart Was Bound to a Minimum Purchase

Under Arkansas law, the "primary rule" in construing a contract "is that the court must, if possible, ascertain and give effect to the intention of the parties." *Smith v. Arrington Oil & Gas, Inc.*, 664 F.3d 1208, 1212 (8th Cir. 2012). "Arkansas law requires courts to 'look to the contract as a whole and the circumstances surrounding its execution to determine the intention of the parties.'" *Id.* "The best construction [of a contract] is that which is made by viewing the subject of the contract, as the mass of mankind would view it, as it may be safely assumed that such was the aspect in which the parties themselves viewed it." *Wal-Mart Stores, Inc. v. Coughlin*, 255 S.W.3d 424, 429 (Ark. 2007).

When interpreting individual provisions "literally" would lead to "nonsensical" results contrary to what the parties "obviously intended," courts applying Arkansas law will not adopt such interpretations over more reasonable interpretations based in the full context of the agreement. *Rains v. Jones*, 905 F.3d 545, 551 (8th Cir. 2018). Separately negotiated provisions demonstrate the parties' intent better than preprinted boilerplate. *Leonard v. Merchants & Farmers Bank*, 720 S.W.2d 908, 910 (Ark. 1986).

The contract-interpretation question here is straightforward.  The first line of the Commitment states: "***Walmart is committed to purchase*** from London Luxury a ***minimum*** of 6,072,770 master cartons of nitrile examination gloves (the 'Product') on a ***noncancellable and irrevocable*** basis."  WM.App.0382, R.Doc.248-14.at.3, WM.Add.122.  That language is clear and unambiguous.  Walmart has a commitment to purchase a minimum number of gloves.  Walmart cannot cancel that commitment.  And Walmart cannot revoke it.

The "circumstances surrounding [the contract's] execution" confirm that the text implements the parties' intent that the agreement be truly noncancellable and irrevocable.  *Smith*, 664 F.3d at 1212.  At the time of the Commitment, Walmart had already agreed to sell Heypex 5.5 billion gloves and needed to obtain them from London Luxury.  But unless the bank financing the transaction was "absolutely comfortable that this contract was noncancellable," the deal would be off—and Walmart would stand to lose the handsome profits it hoped to reap.  *Supra* 7.  So the parties drafted the Commitment to provide "exactly what the bank need[ed]" to ensure that Walmart's prior promises that it would "buy[] 52 weeks[']" worth of gloves "no matter what" were truly "legal and binding."  LL.App.0185, R.Doc.498-1.at.67.  Small asked Walmart's lawyer to "put together a letter stating 12-month committed quantity is unconditional, and won't be canceled."  LL.App.0207, R.Doc.498-2.at.81.  The result was the Commitment,

with the "noncancellable and irrevocable" language Walmart's lawyers approved.

Walmart is in the uncomfortable position of asking this Court to hold that the

agreement must be interpreted to mean the exact opposite of what the parties

obviously intended and what the text of the very first line of the agreement plainly

says.

      2.  Walmart's Interpretation Nullifies the Language That Made the
          Transaction Possible

Walmart does not confront the plain text of the Commitment's core promise

or the circumstances of its execution.  Instead, Walmart argues the parties wrote

the "noncancellable and irrevocable" Commitment and simultaneously intended to

render it a nullity because, a few sentences later, the contract addresses certain

requirements from a lengthy boilerplate document and says there that in the event

of a conflict the boilerplate controls.  Walmart says that because the boilerplate

elsewhere includes a no-business-expectation clause, the parties intended the latter

to eliminate the "noncancellable and irrevocable" Commitment.  The district court

correctly rejected this argument.

Walmart's conflicts-clause argument fails to give the Commitment its

common-sense meaning, fails to look at the Commitment as the parties themselves

viewed it, ignores all context, and creates absurd results.  *Wal-Mart*, 255 S.W.3d at

429; *Smith*, 664 F.3d at 1212; *Rains*, 905 F.3d at 551.  Walmart gives the

"noncancellable and irrevocable" language zero effect.  That construction is

absurd, because that language was the centerpiece of the $500 million transaction. Without it, there was no deal. Walmart's tortured reading is the opposite of what the parties "obviously intended." *Id.* at 551.

And it is simply untenable to construe the Commitment as meaning the parties intended to create a "noncancellable and irrevocable" "commit[ment] to purchase a minimum" six billion gloves and then, a few sentences later, intended to completely unravel that commitment by referring to fifteen single-spaced pages of boilerplate. Walmart does not explain why a normal user of the English language—much less the multiple sophisticated Walmart executives and in-house lawyers who approved making the deal "noncancellable and irrevocable" to satisfy commercial lending interests—would intend that bizarre result or draft the agreement that way.

The district court emphasized repeatedly that Walmart was twisting the Commitment to mean the opposite of what it said. At summary judgment, the district court correctly held it was nonsensical to interpret the agreement as meaning that the parties agreed to have a six-billion-glove purchase and, "at the same time, have no minimum purchase obligation." WM.App.0610, R.Doc.399.at.41, WM.Add.41. As Judge Brooks said succinctly in denying Walmart's Rule 50(a) motion: "[W]hen you harmonize the different provisions, you can't interpret those in such a way that it leads to an absurd result…. [T]here's

just no way that Walmart can say out of one side of its mouth that the purchase

agreement is noncancellable and irrevocable, and on the other side, say that it's not

a commitment to purchase any minimum quantity.  And ***I don't get a whole lot of***

***opportunities to speak to the Eighth Circuit, but I'm speaking to them now***."

Trial.Tr.2118:19-21, 2121:5-10.

### 3. The Minimum-Purchase Commitment Harmonizes with All Other Provisions, Without Any Necessary Conflict

It is not necessary to resort to Walmart's "absurd result" to give meaning to

the boilerplate.  Under Arkansas law, as Walmart concedes, "a '[c]onstruction that

neutralizes any provision of a contract should *never* be adopted if the contract can

be construed to give effect to all provisions.'"  WM.Br.54 (quoting *Smith v. S.*

*Farm Bur. Cas. Ins. Co.*, 114 S.W.3d 205, 207 (Ark. 2003)).  A recent decision of

this Court interpreting Walmart's boilerplate confirms there is no conflict, and the

provisions can be harmonized in other ways too.

**a.**  This analysis begins and ends with the Court's precedential decision in

*K7*, which was decided after Walmart filed its opening brief and holds that the no-

business-expectation clause does not undo specific commitments.  In *K7*, a supplier

entered into Walmart's supplier agreement with a boilerplate no-business-

expectation clause like the one here.  (It said "[p]rojections, past purchasing history

and representations about quantities to be purchased are not binding on Company"

and "Company has no obligation and makes no promises to purchase any

24

minimum amount of Merchandise from Supplier."  Addendum, No. 24-1366 (8th Cir. Jun. 17, 2024).)  Walmart sent the supplier emails where Walmart "[c]onfirmed" its "commitment" to purchase a specific quantity of goods.  143 F.4th at 934.  Walmart argued its boilerplate no-business-expectation clause conflicted with and voided those commitments.

This Court unanimously rejected Walmart's argument and stated that there was in fact no conflict between Walmart committing to purchase goods and the boilerplate no-business-expectation clause.  The Court distinguished between mere "projections or representations about quantities to be purchased"—which fall within the ambit of the no-business-expectation clause—and binding purchase "commitments" or "confirmations of orders," which do not.  *Id.* at 938.  Walmart "committed" itself in writing to purchase specific amounts of goods, and the no-business-expectation clause did not apply to, and did not negate, those commitments.  *Id.*

*K7* is controlling and disposes of Walmart's primary argument.  While the boilerplate provides that Walmart is not bound by mere representations, projections, or informal discussions, a "noncancellable and irrevocable" "commit[ment] to purchase" a specific "minimum" quantity, signed in writing to meet the requirements of the seller and its bank, is no mere representation or projection.  As Small wrote to London Luxury at the instruction of his superiors

before the Commitment was even signed, "[t]here have been multiple emails and letters stating that Walmart is taking 12 months of the supply you have secured. This is legal and binding even though it is via email. We are buying 52 weeks no matter what." LL.App.0184-85, R.Doc.498-1.at.66-67. Then Walmart followed up with the Commitment: a signed reconfirmation of a "noncancellable and irrevocable" "commit[ment] to purchase" a "minimum" quantity; not a projection or representation. The commitment was memorialized yet again in the Side Letter, as discussed above and below. And although the boilerplate clarifies that the generic Supplier Agreement does not itself create any obligation or promise to purchase, that obviously does not apply to a separately agreed commitment. As in *K7*, Walmart's no-business-expectation clause simply does not apply to Walmart's specific Commitment.

*K7* instructs that, while the no-business-expectation clause protects Walmart from preliminary discussions with suppliers that fall short of real commitments, that is not the situation here. As the boilerplate describes the outer limit of the clause, suppliers should not "assume" Walmart will purchase specific quantities "even if Supplier's impression is based on discussions Supplier may have had with Company representatives." WM.App.0251, R.Doc.140-5.at.13, WM.Add.135. A binding commitment is not an "assumption" or "impression" based on

"discussions." Emails sufficed to create a commitment in *K7*, and the Commitment here is far stronger.[5]

**b.** Although *K7* ends the inquiry, the Court can also reject Walmart's argument in other ways.

The Court can give effect to all terms without nullifying the "noncancellable and irrevocable" Commitment by construing the boilerplate's background clauses as applying to other, one-off sales not governed by the specifically negotiated Commitment. Indeed, this Court has held—under Arkansas law, in one of Walmart's authorities—that applying a specifically negotiated agreement rather than applying allegedly conflicting terms in a background master agreement "does not render the … provisions in the [master agreement] a nullity, as they would still govern less formal … work … that is not covered by a separate and complete written agreement." *Thornton Drilling v. Nat'l Union Fire Ins. Co.*, 537 F.3d 943, 947 (8th Cir. 2008).

Just so here. The boilerplate—which did not specify a good being sold, did not include price, and would "continue in effect" indefinitely (WM.App.250,

_____

[5] *K7* also disposes of Walmart's argument that the Commitment could not supply terms missing from the boilerplate (such as the good being purchased, price, and quantity). WM.Br.31-33. In *K7*, Walmart insisted that only orders made through specific processes in the boilerplate could be binding, but the Court held that written "commitments," including emails, can equally bind Walmart, notwithstanding the no-business-expectation clause. 143 F.4th at 937.

R.Doc.140-5.at.12, WM.Add.134)—functions in the background to govern typical one-off discussions *beyond* the minimum-purchase commitment that might occur in the future, such as for bedding, towels, or more gloves. The Commitment, by contrast, is a negotiated deal for a "minimum" quantity of a specific good at a fixed price for a specific period. Walmart was bound to purchase the identified "minimum" quantity of gloves, but not to purchase anything more absent a specific agreement. The "noncancellable and irrevocable" clause and the no-business-expectation clause both have effect.

This construction also properly interprets and gives effect to the conflicts-resolution clause. The text of that clause does not clearly encompass Walmart's no-business-expectation policy. *Supra* 10. In a two-sentence paragraph under the header "Agreement and Certificate of Insurance," the first sentence reflects that London Luxury agreed to (1) provide an updated certificate of insurance, (2) meet the Commitment's other requirements, and (3) meet the Supplier Agreement's "*compliance and regulatory requirements*." The second sentence adds that, to the extent there is a conflict with the Supplier Agreement, "the terms of the Supplier Agreement will control." WM.App.0382, R.Doc.248-14.at.3, WM.Add.122.

In context, it is clear the parties intended to have the boilerplate control only if there was a conflict with the "requirements" London Luxury must meet as stated in the preceding sentence. *Rains*, 905 F.3d at 551 (interpreting the "plain

meaning" of the second sentence of a paragraph in light of the context provided by the preceding sentence).

That interpretation makes sense, and it gives meaning to all parts of the Commitment without nullifying Walmart's "noncancellable and irrevocable" commitment. This reading makes sense of the fact that the boilerplate includes more-detailed descriptions of the same "compliance and regulatory" requirements that the Commitment describes at only a high level. One example involves product-testing and factory requirements, which were hotly contested issues at trial. *See, e.g.*, WM.App.0382, R.Doc.248-14.at.3, WM.Add.122 (Commitment testing provision says only "Walmart *may* require *initial* testing [for] regulatory standards"); WM.App.0244, R.Doc.140-5.at.6, WM.Add.128 (Supplier Agreement "*requires* testing of *approval*, *pre-production*, *production*, *and in[-]store samples* by a *lab selected by [Walmart]*"). The conflicts-resolution clause thus clarifies that, should the two descriptions of the same requirement conflict, the Supplier Agreement's version prevails.

What does *not* make sense is Walmart's theory that the parties agreed in the first sentence of the Commitment that Walmart "commit[s] to purchase" a specific "minimum" quantity of gloves "on a noncancellable and irrevocable basis," but then, in the different context of *regulatory requirements*, agreed to *neutralize* that commitment by referencing boilerplate.

\*\*\*

In sum, *K7* instructs that Walmart's no-business-expectation clause applies to projections and impressions, but it does not vitiate signed, binding commitments, especially not "noncancellable and irrevocable" ones. The Court can also give meaning to all parts of the contract without nullifying Walmart's central commitment by reading the no-business-expectation boilerplate to apply only to other transactions between the parties, or by reading the conflicts-resolution clause to apply only to the compliance and regulatory items discussed in the paragraph in which that clause appears. All these interpretations give meaning to the Commitment's core "noncancellable and irrevocable" term, whereas Walmart's does not.

## B. Walmart's Authorities Support London Luxury

Walmart identifies *no* authority supporting the radical result it seeks: nullifying the core term in a specifically negotiated $500 million agreement through a tangential reference to lengthy boilerplate. In each of Walmart's cases, the court either interpreted the agreement to *avoid any conflict* or applied more-specific provisions over boilerplate. *E.g.*, *Thornton*, 537 F.3d at 947 (giving effect to all provisions and concluding the "contract that applies more specifically to the drilling work in question is controlling").

Consider *Internaves de Mexico s.a. de C.V. v. Andromeda Steamship Corp.*, 898 F.3d 1087 (11th Cir. 2018), a case Walmart cites that actually supports London Luxury. *Internaves* explains a contract "should be read to give effect to all its provisions and to render them consistent with each other," and to resort to a conflicts-resolution clause *only if and after* that effort fails. *Id.* at 1093 (cleaned up). In that case (unlike here), the conflict was unavoidable. Moreover, although *Internaves* relied in part on the conflicts-resolution clause, it also relied on the "canon of contract interpretation elevating specific terms over more general ones," and the fact that the inconsistency between the provisions "essentially amount[ed] to a small error that cannot undermine [the parties'] manifest intent, as they wrote it" in the specifically negotiated term. *Id.* at 1094. That reasoning supports London Luxury.

Walmart's remaining citations are likewise unavailing. In the first, as in *Internaves,* the conflict was unavoidable, and the court applied the more-specific agreement over the preprinted boilerplate incorporated by reference. *Security Benefit Life Ins. Co. v. Military Assocs.*, 1992 WL 93275, at *1 (Ark. Ct. App. Apr. 22, 1992) (one contract provided for delay in vesting payments; another said the payments vested immediately). In the second, although the court referenced a conflicts-resolution clause, the court read the relevant provisions as not conflicting because "courts should interpret a contract such that no portion is rendered

meaningless." *Ray Bell Constr. Co. v. Dep't of Transp.*, 356 S.W.3d 384, 388 (Tenn. 2011) (harmonizing "Special Provision" and "Standard Specification" and giving primary effect to the Special Provision).

Walmart relies on *Randall Ford, Inc. v. Randall*, 635 S.W.3d 507, 518 (Ark. Ct. App. 2021), but that case also supports London Luxury. The court read two related agreements together, and after doing so, determined that one of the agreements contained a "scrivener's error" that could not overcome the parties' manifest intent, which was clear when reading both agreements. *Id.* at 518. Here, as in *Randall*, the plain text of the agreement as a whole makes the parties' intent obvious.

## C. The Side Letter Reaffirmed the Purchase Commitment

Were there any remaining doubt that the agreement included a binding minimum-purchase commitment, the Side Letter resolves it.

Following the Commitment and the latest supplier agreement, Walmart in the Side Letter expressly reaffirmed (and even increased) the "*contracted quantity*" Walmart was obligated to purchase: Walmart "irrevocably confirm[ed]" it would renew a letter of credit "until the exhaustion of the *total contracted quantity* of [7 billion] gloves placed on order for a period of 12 months." LL.App.0054, R.Doc.259-17.at.8. As the district court concluded, this Side Letter is among the

multiple writings forming the parties' agreement. WM.App.0613-14,
R.Doc.399.at.44-45, WM.Add.44-45; WM.App.0636, R.Doc.455.at.12.

Walmart does not dispute these points but instead says the Side Letter is
"only a financial instrument." WM.Br.34. That is wrong. Walmart conflates the
Side Letter with the letter of credit. In transactions involving letters of credit,
usually "three separate and distinct" contracts are involved: (1) the "contract of the
bank … with its customer," (2) the "underlying contract between the customer and
the beneficiary which results in the letter of credit issuance," and (3) the "letter of
credit itself, which is a contract between the issuing bank and the beneficiary."
*Bank of Newport v. First Nat'l Bank & Trust Co. of Bismarck*, 687 F.2d 1257,
1261 (8th Cir. 1982). The Side Letter between Walmart and London Luxury is
part of item 2 above; it is not the same as the *letter of credit* the bank issued to
London Luxury (item 3). Thus, the Side Letter—as part of the parties' underlying
agreement distinct from agreements with the bank—expressly reaffirms Walmart's
commitment to purchase a specific "contracted quantity."

### D. The Extrinsic Evidence Unequivocally Proves Walmart Intended to Be Bound to a Minimum-Purchase Commitment

In a last-ditch effort, Walmart alternatively asks for remand to allow the jury
to hear extrinsic evidence and resolve a purported ambiguity about whether the
parties intended Walmart to be bound to a minimum-purchase commitment. The
district court denied that alternative request because "no reasonable juror could

believe" Walmart did not want a "minimum purchase quantity." WM.App.0609, R.Doc.399.at.40, WM.Add.40. That was correct.

After extensive discovery, *every piece* of contemporaneous evidence reflects that Walmart executives and lawyers intended to agree and did agree to a minimum-purchase commitment to satisfy London Luxury and its bank, and then understood Walmart was bound to one. WM.App.0579-94, R.Doc.399.at.8-25, WM.Add.8-25 (summary-judgment decision recounting undisputed facts that Walmart intended a minimum-purchase commitment and understood it was bound). Nothing at trial changed that. *See supra* 4-12; Trial.Tr.419:12-14, 666:16-19, 724:13-25, 1963:25-1964:10. Walmart cannot cite a single shred of contemporaneous evidence showing Walmart *actually* intended or believed it had no minimum-purchase commitment.

In response, Walmart says the parties followed the purchase-order process. Of course they did. Purchase orders serve ministerial functions like designating which internal Walmart department distributed the gloves, or how many gloves were Small/Medium/Large. WM.App.0415, R.Doc.248-23.at.4. Following procedures for purchase orders says nothing about whether Walmart intended to agree to a minimum-purchase commitment to satisfy the bank and secure the product it wanted and had promised to resell to Heypex.

Rather than cite evidence creating a genuine fact dispute, Walmart misrepresents the district court's statements. Walmart says Judge Brooks admitted during a sidebar that his summary-judgment decision was wrong. WM.Br.36. The opposite is true. The transcript shows that after Judge Brooks said "Walmart was proceeding under the theory that at all times their supplier agreement was the trump card of all trump cards" (which Walmart cites), Judge Brooks's *very next sentence*—which Walmart improperly *omits*—says that was not his own characterization of the evidence but rather was Walmart's "theor[y] [that was] presented to the Court on summary judgment"—the theory he *rejected* as unsupported. Trial.Tr.1970:2-10. He then explained that his ruling rejecting Walmart's theory was "very consistent with the evidence that has been introduced in the course of this trial." Trial.Tr.1970:13-15. Later, Judge Brooks again said, "the Court had quite a bit of evidence available to it on summary judgment … [and] as the trial evidence came in, the Court is even more persuaded now than it was before." Trial.Tr.2118:15-23. Post-trial, Judge Brooks repeated: the "trial evidence supports the Court's findings on summary judgment." WM.App.0736, R.Doc.512.at.39, WM.Add.96.

With mountains of evidence showing Walmart wanted a minimum-purchase commitment and understood it was bound, and *zero evidence* to the contrary, summary judgment was proper.

## II.    Walmart's "Express Termination Clause" Argument Fails

Walmart next seeks to avoid liability by taking the remarkable positions that (a) the parties intended that their *$500 million contract* could be terminated due to *immaterial* breach, and (b) the jury's finding of no immaterial breach must be thrown out.  But Walmart itself requested a jury instruction stating that only material breach could excuse performance.  And that instruction was correct as a matter of Arkansas law and the parties' agreement.  Walmart's argument also fails because Walmart lost any termination right when it repudiated the agreement. Lastly, there is no basis to throw out the jury's verdict.

### A. Walmart Invited the Purported "Error" It Now Asserts

Walmart cannot be heard to argue that the Commitment was subject to termination for immaterial breach.  Walmart requested and obtained the very jury instruction it now contests, and failed to object at the charge conference.

When a party's "proposed instructions includ[e]" an "instruction similar to the instruction given by the court, at a minimum" they "abandoned their previous argument, and perhaps invit[ed] the error of which they now complain," and therefore any argument that a "motion for summary judgment … preserves the claim for appeal is meritless."  *Starks v. Rent-A-Ctr.*, 58 F.3d 358, 363 (8th Cir. 1995); *Cent. Baptist Church of Albany, Georgia, Inc. v. Church Mut. Ins. Co.*, 2025 WL 2026797, at *6-7 (11th Cir. July 21, 2025) (party "invited jury instructions that

allowed for" the jury's decision and "cannot now argue that such an award contradicts the language of the [agreement]").

Walmart requested a jury instruction stating: "A breach that is not material does not excuse the performance of the other party." That language should be used "when there is an issue as to whether the breach was material." Ark. Model Jury Instr. 2427 Notes.

Walmart requested the following:

> **Walmart's Defense of Material Breach**
> . . .
> A "material breach" is a failure to perform an essential term or condition that ***substantially defeats the purpose of the contract*** for the other party.
> A material breach by London Luxury excuses the performance of Walmart (and allows Walmart to sue for damages on the whole contract). ***A breach that is not material does not excuse the performance of the other party*** (but does allow the party to seek damages for the partial breach).

LL.App.0332.

Thus, Walmart's own proposed instruction says (correctly) an immaterial breach by London Luxury "does not excuse" Walmart's performance. In Walmart's own words, Walmart's "defense" was a "defense of material breach," not a defense of immaterial breach. The key jury question, according to Walmart, was whether a breach "substantially defeat[ed] the purpose of the contract."

Walmart submitted its proposed instruction *before* any summary-judgment ruling, so this is not a situation where Walmart merely implemented an earlier

summary-judgment ruling. And Walmart failed to object at the charge conference. Trial.Tr.2150:25-2151:20. The final instruction adopted Walmart's language. WM.App.0641, R.Doc.455.at.17.

Below, Walmart belatedly argued it had not invited error by saying it had proffered another jury instruction mentioning a termination clause. But that was not even the termination clause Walmart raises on appeal. And no matter what, that instruction still would have been read in conjunction with Walmart's requested instruction that "A breach that is not material does not excuse the performance of the other party." If Walmart did not intend the jury to consider whether breaches "substantially defeat[ed] the purpose of the contract" in determining if Walmart's performance was excused, Walmart would not (and should not) have proposed and agreed to that instruction.

Walmart made a strategic decision to focus its case on material breach. The summary-judgment decision and trial proceeded accordingly. Walmart made its case to the jury and lost. Walmart cannot now appeal based on "error" it invited.

### B. Under Arkansas Law, Breaches Must Be Material

There is a reason Walmart did not seriously pursue an immaterial-breach theory below: it is wrong. Arkansas law is clear that only a prior material breach excuses nonperformance, even where the contract contains a termination clause or similar express condition excusing the obligation to perform.

The Arkansas Supreme Court holds that only if "the plaintiff's breach is material and sufficiently serious" is the "defendant's obligation to perform" excused. *TXO Prod. Corp. v. Page Farms, Inc.*, 698 S.W.2d 791, 793 (Ark. 1985). In *TXO*, an oil-and-gas lease expressly eliminated the lessee's obligation to pay royalties to any successor lessor unless the lessee received advance notice of the change in ownership. *Id.* There was no dispute the lessor breached the notice provision. So the lessee contended the contract expressly provided that the lessee was therefore not obligated to pay. The Arkansas Supreme Court rejected that argument, holding that the lessor's breach was immaterial and did not excuse the lessee's performance, notwithstanding the breach of the express condition. *Id.* The Court held that an "influential circumstance in the determination of the materiality of a failure fully to perform a contract is the extent to which the injured party, here TXO, will obtain the substantial benefit that he reasonably anticipated." *Id.*

Arkansas courts have applied the Arkansas Supreme Court's binding holding to termination clauses more sweeping than the clause here. The decision in *Continental Carbonic Products, Inc. v. Cohen*, 241 S.W.3d 296, 298 (Ark. Ct. App. 2006), is particularly instructive. There, the plaintiff sued his former employer for failing to make required payments under a stock-options agreement. The company countered that its performance was excused because the plaintiff had breached his noncompete agreement. The company argued the stock-options agreement

contained an express clause that freed the company of any obligation to pay after "any" breach of the noncompete agreement: "All future payments will be forfeited for any violations of the employee's Confidentiality and Non-Compete Agreements." *Id.* at 306. That clause was even more termination-friendly than the clause here, as it expressly provided for forfeiture, and referred to "any violations." But the Arkansas court rejected Continental's argument, which is the same argument Walmart makes here. The court applied *TXO* and held "there was sufficient evidence from which the jury could find that Cohen did not *materially* breach" because certain "testimony, if believed, would tend to show that Continental received the benefit of its bargain, an influential circumstance in the determination of the materiality of a breach." *Id.* at 311.

The Arkansas court in *Vereen v. Hargrove*, 96 S.W.3d 762, 766 (Ark. Ct. App. 2003) assessed another termination clause, also broader than the one here, and held that a breach must be material to allow termination. The clause read: "The failure … by LESSEES to pay … at the times and the manner provided … shall … permit the LESSOR at her option and without any liability … to terminate this lease." The lessee admitted a breach through late payment, and the clause contained a "without any liability" clause to excuse nonperformance. *Id.* at 772. The court applied *TXO* and held that "for one party's obligation to perform to be discharged, the other party's breach must be material," which is measured by "the

extent to which the injured party will obtain the substantial benefit that he reasonably anticipated." *Id.* The court then held the factfinder did not err in finding no "material breach," in part because the lessor did not complain about it until months later. *Id.* at 772-75. Similarly, here Walmart continued to purchase millions of dollars' of goods from London Luxury for months after learning of supposed breaches by London Luxury. *Supra* 17.

The clause Walmart relies on, in which Walmart "reserve[d] the right to … cease to do business … if Supplier fails to comply with any terms of the Standards" (WM.App.0251, R.Doc.140-5.at.13, WM.Add.135), is less termination-friendly than the ones Arkansas courts held were subject to a materiality requirement.

Walmart's citations are not to the contrary, and only undermine its position. Walmart cites *Boellner v. Clinical Study Centers, LLC*, 378 S.W.3d 745, 754 (Ark. 2011), but that case reaffirms the need to show material breach. There, a clause permitted termination if the defendant committed "fraud" against his employer, "failed to perform the services … with diligence or competence," or for other "material breach." The Arkansas Supreme Court did not hold that an immaterial lack of "diligence" could justify termination; to the contrary, the Court applied the same requirement to all termination triggers: "[A] relatively minor failure of performance on the part of one party does not justify the other in seeking to escape

any responsibility under the terms of the contract; *for one party's obligation to perform to be discharged, the other party's breach **must be material**.*"  *Id.*  The Court then conducted a detailed materiality analysis and held that "substantial evidence supports the jury's verdict that Boellner *materially* breached."  *Id.* at 755.

Walmart's other cited authorities do not address whether an immaterial breach can justify termination.  WM.Br.39-40.  For example, *Gunn v. Farmers Ins. Exch.*, 372 S.W.3d 346, 351-52 (Ark. 2010) stands for the unremarkable proposition that a clause permitting cancellation at will upon three months' notice is not displaced by another provision allowing prompt termination for breach; the Court did not apply the latter provision, much less hold that materiality would not be required.  Similarly, *Union National Bank of Little Rock v. Federal National Mortgage Assoc.* considered only a "without cause" termination clause.  860 F.2d 847, 853 (8th Cir. 1988).  The issue here is not cancellation at will, so those cases are inapposite.

This Court has already applied the Arkansas rule when other states take the same approach as Arkansas.  In *Reuter v. Jax Ltd.*, 711 F.3d 918, 920-21 (8th Cir. 2013) (applying Minnesota law), the contract contained a clause stating Reuter could terminate if Jax "default[ed] in the performance of any of the terms."  This Court held "the breach must be material," and "even when express conditions of the contract are violated, the breach is not necessarily material."  *Id.*

## C. The "Noncancellable and Irrevocable" Agreement Does Not Allow for Termination for Immaterial Breaches

Rather than cite Arkansas law, Walmart relies primarily on treatises saying a contract can potentially allow termination upon immaterial breach as long as the contract contains a *clear, express statement* that immaterial breach permits termination. WM.Br.39. That rule is plainly not satisfied here, because there is no clear statement allowing termination for immaterial breach. To the contrary, the Commitment is "noncancellable and irrevocable." So even applying Walmart's treatises, Walmart's argument still fails.

The clear-statement rule is easy to apply. For example, a clause providing that "if [plaintiff] '*fails to perform any of its obligations* … then [defendant] may cancel" "does not abrogate the common-law principle of materiality because **it does not state clearly that cancellation may be based on *any breach, material or otherwise*,**" which "must be done … to abrogate a principle which is so fundamentally embedded in the common law." *RW Power Partners, LP v. Virginia Elec. & Power Co.*, 899 F. Supp. 1490, 1501-02 (E.D. Va. 1995) (applying Williston). Indeed, "[a] court is not at liberty to read" in a term like "materially or non-materially" because that would "abrogate[] the common law by judicial interpretation." *Id.* Similarly, the Fifth Circuit holds that a clause permitting termination if the other party "fails to pay any rental payment" does not "'clearly' exclude[] the requirement of material breach" because the "language of this

provision makes no mention of materiality" regarding the term "fails to pay." *Affordable Care, LLC v. JNM Off. Prop., LLC*, 2024 WL 1234928, at *8 (5th Cir. Mar. 22, 2024).  As discussed below, the similar contract language here fares no better.

> 1.  The Plain Meaning of "Noncancellable and Irrevocable" Does Not Permit Termination for Immaterial Breaches

Walmart's commitment is "noncancellable and irrevocable."  That is obviously not a clear statement allowing termination for immaterial breach.  The plain meaning of "noncancellable and irrevocable" is clear.  "By expressly describing the [agreement] as 'irrevocable,' the parties contemplated that the [agreement] *could not be revoked under any circumstances*."  *Drut Techs., Inc. v. Microsoft Corp.*, 2022 WL 2156962, at *5 (W.D. Wash. June 15, 2022) (collecting cases).  Moreover, as the Fifth Circuit holds, "'irrevocable' must mean something beyond 'not revocable at will,' since otherwise the use of both 'irrevocable' and 'perpetual' [here, noncancellable] would be superfluous."  *Matter of Provider Meds, LLC*, 907 F.3d 845, 856 (5th Cir. 2018).  Therefore, using both "noncancellable" *and* "irrevocable" not only bars "revok[ing] at will; the use of 'irrevocable' goes one step further and indicates that the license ***may not be revoked for any reason, even a breach*."  *Id.*  Again, it is simply not reasonable to interpret the agreement as meaning the parties intended for the commitment to be

noncancellable and irrevocable but also intended an indirect reference to lengthy boilerplate to authorize termination for immaterial noncompliance.

### 2. The Termination Clause Does Not Expressly Permit Termination for Immaterial Breach

Even ignoring the core "noncancellable and irrevocable" term, and reading the termination clause in isolation without the full context of the agreement, the clause does not satisfy the clear-statement rule.

The boilerplate clause Walmart relies on cannot be distinguished from the clauses that the Fifth Circuit and other courts have held do *not* satisfy the clear-statement rule: Walmart "reserves the right to … cease to do business … if Supplier fails to comply with any terms of the Standards." WM.App.0251, R. Doc. 140-5 at 13, WM.Add.135. It does not expressly provide for termination if Supplier fails to comply "*in any way*," or "*materially or otherwise*" fails to comply. *Affordable Care*, 2024 WL 1234928, at *8; *RW Power*, 899 F. Supp. at 1502. The district court correctly refused to read those absent words into the contract, which Walmart's construction would require.

### 3. The District Court Correctly Harmonized the Supposedly Conflicting Provisions

Finally, this Court must harmonize the provisions to align with the parties' intent. *Smith*, 114 S.W.3d at 207. That is exactly what the district court did. As explained *supra*, London Luxury's interpretation harmonizes all terms by applying

the termination clause to other sales lacking a separately negotiated contract with a special "noncancellable and irrevocable" term. *See Thornton*, 537 F.3d at 947. That is what the district court held, reasoning that "[a]t best," Walmart's immaterial-breach argument might apply "in the ordinary retail context [where] Walmart has no minimum purchase obligations," but not given "the exceptional, pandemic-motivated 'noncancellable and irrevocable' language." WM.App.0723-24, R.Doc.512.at.26-27, WM.Add.86-87. Only if a supposed breach substantially defeats the purpose of the contract could Walmart terminate. WM.App.0611-12, R.Doc.399.at.42-43, WM.Add.42-43. The district court's interpretation added no words: it simply retained Walmart's common-law right to be excused for prior material breach.

This approach gives the words their plain meaning, aligns with the parties' obvious intent under the circumstances, and avoids absurd results. *Rains*, 905 F.3d at 551. Indeed, at trial, Walmart elicited testimony, and argued repeatedly, that if London Luxury gave a Walmart employee a bottle of water during a business meeting, that was a gift that breached the Standards. Trial.Tr.128:1-12, 611:17-25. The parties plainly did not intend that a single shared bottle of water could excuse Walmart's nonperformance of this $500 million contract, a deal that never would have been consummated unless the bank was "absolutely comfortable" Walmart would not cancel.

***

Under Arkansas law and the parties' agreement, Walmart could not terminate for immaterial breach. Walmart's real beef is that it thinks London Luxury materially breached. But Walmart on appeal does not challenge the jury's verdict of no material breach.

### D. Walmart Lost Any Asserted Reserved Right to Terminate Through Prior Repudiation

There is yet another independent reason why Walmart's termination-clause argument fails. Walmart lost any right to terminate by having already repudiated the contract one month earlier based on issues with its own customer.

"[I]f a party … repudiates a contract, it loses its right to terminate that contract." *Roye Realty & Developing, Inc. v. Arkla, Inc.*, 78 F.3d 597 (10th Cir. 1996). As Walmart's own authority explains, that is so even if a party had a contractual right to terminate: "A party who has reserved a power of termination *loses that power* if it commits a total breach of the agreement [here, via a prior repudiation] and thereby discharges the other party. A subsequent notice of termination by the breaching party has no effect upon the other party's right to full damages for the existing total breach." 13 *Corbin on Contracts* § 68.9 (2023).

The text of the clause Walmart invokes makes clear that it is precisely this type of "reserved power to terminate." It says Walmart "*reserves the right*" to

"cease to do business with Supplier."  WM.App.0251, R.Doc.140-5.13, WM.Add.135.

Therefore, Walmart lost any reserved power to terminate for breach on November 11 because "the date Walmart cancelled the contract" was "October 22, 2021," the day Walmart emailed London Luxury to "stop producing gloves," as "both parties agree."  WM.Br.18; WM.App.0754, R.Doc.513.at.11, WM.Add.114; Trial.Tr.274:11-275:11.

Walmart might claim this rule is unfair because Walmart was supposedly unaware of the circumstances giving rise to the alleged breach.  But consider every supplier that ships millions of goods to Walmart under a Supplier Agreement.  Accepting Walmart's approach means that whenever Walmart flagrantly repudiates its commitments, Walmart can escape liability if it uncovers a previously unknown immaterial breach.  That is not the law.

Regardless, if an undisclosed breach is truly problematic, the other party can successfully argue that it "substantially defeat[ed] the purpose of the contract."  Walmart simply lost on that issue before the jury.  A party can also counterclaim for partial breach and receive damages.  Walmart tried that too—and lost again.  And for all Walmart's indignation, Walmart did not even terminate London Luxury's business after learning of Small's conduct, instead continuing to order millions of dollars of other products.  Trial.Tr.2290:20-2293:3.

### E. Walmart Cannot Overturn the Jury's Verdict of No Breach

There is a final reason why Walmart's legal theory of immaterial breach fails: the jury found no breach at all, even though partial breach was an option for Walmart's breach-of-contract counterclaim. No material breach. No immaterial breach. WM.App.0680, R.Doc.458.at.7 (3A-3B). Thus, even if Walmart *could* terminate for immaterial breach, Walmart must convince this Court to throw out the jury's verdict. Walmart cannot meet its burden.

#### 1. Rule 50 Requires Extreme Deference to the Verdict

As *K7* reiterates, "factual and credibility determinations [a]re uniquely in the jury's purview and will not be disturbed on appeal." 143 F.4th at 939. On a motion for judgment notwithstanding the verdict, this Court must "consider the evidence in the light most favorable to the prevailing party" and "***must assume that all conflicts in evidence were resolved by the jury in favor of the prevailing party***." *Ralston Purina Co. v. Parsons Feed & Farm Supply, Inc.*, 364 F.2d 57, 59 (8th Cir. 1966). This Court "cannot reweigh the evidence or evaluate questions of credibility," because those are quintessential jury tasks. *Diesel Mach., Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 832 (8th Cir. 2005).

#### 2. Walmart Argued at Trial the "Whole Case Hangs on Credibility"

Walmart's attempt to overturn the jury's verdict fails at the outset, because every breath of Walmart's trial narrative depended on unreviewable credibility determinations. Walmart's theory of a breach based on conflict of interest was that

Garrett Small was a "traitor" whose honor and integrity were corrupted by London Luxury's supposed "lies" and manipulation. Trial.Tr.122:4, 2379:9-20. This is a classic case of fact disputes that can be resolved only after judging credibility.

Walmart agreed, telling the jury: "***This whole case for them hangs on the credibility of Marc Jason.***" Trial.Tr.2377:6-7. Walmart's case equally hangs on the credibility of Small, as the jury had to determine whether he kept his independence. He gave critical testimony that he remained independent and acted with integrity, yet he also unreliably immediately agreed to a handful of self-serving, conclusory prompts from Walmart's lawyers. His motivation to agree to Walmart's false narrative was plain to the jury: he admitted on the stand that he "***lied under oath in this lawsuit to help Walmart and to hurt London Luxury***," that his *current employer* critically depends on Walmart's continued goodwill, and that he was terrified of Walmart's power because he is "the sole provider for a family of five." Trial.Tr.1774:15-1775:25, 1784:5-15. In determining Small's independence, his testimony presented a complex thicket of credibility for the jury to assess, and they were entitled to believe his testimony only where it supported London Luxury (or whatever mix they found credible). As London Luxury argued: "[Small] followed the rules and did his job…. That's what he said on the stand. ***And you could hear in his voice, the way he spoke with conviction, that he did it right…. And you could see his manner when he spoke. Did you notice how he***

***looked over to Walmart's lawyers every now and again? How scared he was of***

***them?"*** Trial.Tr.2422:12-20. There is simply no way to reverse a jury verdict

about "integrity" and "lies" without substituting the Court's credibility

determinations for those of the jury, and that is impermissible.

>   3. The Fact Determination at Issue Is Inherently Subjective and
>      Required Applying the Jurors' "Common Knowledge" as the
>      "Voice of the Community"

Moreover, the fact dispute Walmart wants resolved in its favor is uniquely

suited for resolution by a jury of Walmart's community members. The district

court correctly held that the standard London Luxury supposedly breached is

inherently subjective, and determining whether its airy, vague verbiage was

complied with is in the eye of the beholder—a classic jury question.

WM.App.0720-21, R.Doc.512.at.23-24, WM.Add.80-81. The subjectivity of the

contract's "non-specific gray line" (*id.*) makes this case a particularly inappropriate

instance to overturn the unanimous verdict of a jury drawn from Walmart's

community.

To determine whether such a subjective and vague breach occurred, the jury

was instructed, and invited by Walmart's counsel, to use their "common

knowledge" "in the light of [their] own observations and experiences in the affairs

of life." WM.App.0634, R.Doc.455.at.10; Trial.Tr.2316:24-2317:1. Walmart

further told the jury: "you're the voice of the community" and "you're speaking for

the entire community about whether this kind of conduct can be tolerated in business." Trial.Tr.2412:8-14. The community spoke. Walmart improperly asks this Court to nullify the jury's application of their common knowledge.

### 4. Substantial Evidence Supports the Jury's Verdict

Because the Court "must disregard all evidence favorable to the moving party that the jury is not required to believe," and in light of the foregoing, there is no basis to displace the jury's verdict. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). Drawing all inferences for London Luxury, and disregarding Small's testimony where it helped Walmart—which the jury was certainly entitled to do, given his admitted perjury aimed to hurt London Luxury and help Walmart—there was more than sufficient evidence to reject Walmart's counterclaim.

To begin, substantial evidence permitted the jury to conclude Small's independence was not impaired. This is exemplified in the crystal-clear evidence—unrebutted at trial—that immediately before and after the June Letter was signed, Small was ready to terminate London Luxury if it didn't start shipping more gloves soon (which it did). LL.App.0218, R.Doc.498-2.at.107; LL.App.0222, R.Doc.498-2.at.123; Trial.Tr.1736:11-1737:1, 1737:23-1738:6, 1738:25-1739:10; LL.App.0205, R.Doc.498-2.at.29. His readiness to fire London Luxury eviscerates the false notion that Small was "corrupted" and in London

Luxury's pocket; at minimum, the jury could rationally conclude as much. As Small himself testified, he had "Walmart's best interests at heart" throughout the deal. Trial.Tr.1756:18-20. At every step of the transaction, Small advanced Walmart's interests when they diverged from London Luxury's (Trial.Tr.1718:1-15, 1732:10-1734:18) and followed directions from Walmart's executives and in-house lawyers (Trial.Tr.1694:2-1696:6, 1697:11-1700:11, 1704:9-1706:6, 1710:5-1711-25, 1719:10-1720:5, 1722:4-1727:6, 1742:1-1745:22, 1752:24-1756:17).

Contrary to Walmart's suggestion, substantial evidence permitted the jury to conclude that Small did not disregard Walmart policies or procedures for obtaining goods overseas during the pandemic. He testified he *followed* Walmart requirements and that any overrides were *group decisions* that were not done to benefit London Luxury but rather because "Walmart changed some of its normal policies to accommodate for COVID situations temporarily." Trial.Tr.1752:25-1753:2, 1753:8-19, 1753:20-1756:20. The jury heard all the evidence and properly concluded Walmart failed to meet its burden.

The June Letter was not a breach. Small testified it did not have "anything to do with Walmart business," and therefore was not a conflict with Walmart. Trial.Tr.1845:19-25. Walmart previously asserted that "the Standards also make clear that outside business ventures are prohibited *when they create conflicts*," LL.App.0092, R.Doc.301.at.8.n.5, and the jury could have accepted that view.

To find that the June Letter was a breach as a matter of law, this Court would need to engage in factfinding regarding Jason's beliefs about its legitimacy. But that would mean substituting this Court's view of Jason's credibility for the jury's view, even though the jury was best positioned to assess credibility and even though its credibility determinations are unreviewable. As Walmart's counsel argued, "[t]he importance of the … credibility of Marc Jason" is central, as "[h]e's the one who said he thought the June letter … was authentic." Trial.Tr.2382:5-14. Jason testified in detail why he had good reason to believe the June Letter was legitimate before the lawsuit was filed, explained that Walmart executives were aware of the Made-in-America initiative connected to the June Letter, including Small's boss, and testified that Small's later affidavit disavowing its legitimacy in the lawsuit was pretextual. Trial.Tr.965:13-989:3. The Court cannot ignore or choose to disbelieve that testimony on appeal. *Reeves*, 530 U.S. at 151.

Walmart's other breach claims fare no better. Substantial evidence permitted the jury to conclude London Luxury did not provide entertainment or gifts. Jason paid for Small's business-travel expenses to tour an industrial site for a possible factory and considered him for a role in that hypothetical project. Trial.Tr.1720:9-1721:23. This sort of expense is "common on business trips." Trial.Tr.963:8-12.

Substantial evidence permitted the jury to conclude that an employee exploring a potential new job while still working his old job does not violate the

conflict-of-interest provision. Walmart's recruiting rhetoric is overblown: Small disliked Walmart's toxic work culture and thought about leaving, and Jason expressed interest in working with Small if he ever left, but they never discussed compensation or the like. Trial.Tr.964:16-965:12, 1858:9-21. Walmart employees routinely leave Walmart to work for Walmart suppliers. The jury was entitled to conclude, in light of their "own observations and experiences," those discussions did not rise to the level of compromising or appearing to compromise Small's integrity. WM.App.0634, R.Doc.455.at.10.

Finally, Walmart's assertions of "coaching" failed in the face of unrebutted evidence that Small was merely "keeping [Jason] focused to address the issues that were important to [Walmart] management" because those executives "were not in the weeds," which is "very typical" when speaking with senior executives. Trial.Tr.1293:6-17.

### 5. Walmart's Remaining Arguments Are Meritless

Walmart seeks a new trial because the jury would have found partial breach if only it was properly instructed. But Walmart invited the instruction, and the jury found no breach *at all*, material or not, on Walmart's breach-of-contract counterclaim. *Supra* 36-38, 49-55.

Next, Walmart references the tort counterclaim and implies that only materiality can reconcile supposedly inconsistent verdicts. But Walmart waived

any argument the verdicts are inconsistent (Trial.Tr.2460-69): "[I]f trial counsel fails to object to any asserted inconsistencies and does not move for resubmission of the inconsistent verdict before the jury is discharged, the party's right to seek a new trial is waived." *Lockard v. Missouri Pac. R.R.*, 894 F.2d 299, 304 (8th Cir. 1990) ("The purpose of the rule is to allow the original jury to eliminate any inconsistencies.").

In any event, "[w]here there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way," and here the verdicts are easily read as consistent. *First State Bank of Floodwood v. Jubie*, 86 F.3d 755, 759 (8th Cir. 1996). The tort claims set an extremely low bar: if Small did not "deal fairly and honestly" with Walmart, the jury could find for Walmart. WM.App.0653, R.Doc.455.at.29. That is far broader and less demanding than the conflict-of-interest language. The jury could have readily concluded Small was not "honest" when he hid that he discussed a potential job, but nonetheless that London Luxury did not breach a conflict-of-interest provision.

### III. Alternatively, London Luxury Should Prevail on Reformation

Even were the Court to reject all the foregoing, Walmart would still not be entitled to judgment, because the Court should affirm on the ground of reformation. London Luxury pleaded reformation in the alternative. The district court dismissed the claim as moot when it ruled for London Luxury at summary

judgment on its contract arguments.  If this Court accepts Walmart's contract-interpretation arguments, the reformation claim would be revived.

Walmart argues the Commitment unambiguously means no minimum-purchase commitment existed and Walmart could terminate for immaterial breach, but all the evidence points in one direction: that the parties specifically intended to draft an "unconditional," "noncancellable and irrevocable" minimum-purchase commitment that would give the banks and factories certainty, and no reasonable factfinder could have concluded otherwise.  *Supra* 33-35.  Accepting Walmart's argument means the agreement does not accurately reflect the parties' actual intent, and so the agreement must be reformed.  *Driver v. Wood*, 670 F. Supp. 3d 723, 733 (W.D. Ark. 2023).  After reformation, the verdict would stand, for the contract would have been reformed to say there was a commitment and only a material breach would allow termination, just as the district court held.

The jury has already rejected Walmart's likely response that reformation is unavailable due to "unclean hands" by London Luxury that supposedly induced the gloves deal.  Walmart repeatedly argued London Luxury's conduct wrongfully induced the gloves deal, obtaining *four* interrogatories regarding (a) Small's authority, (b) tort damages for gloves Walmart paid for, (c) Walmart's breach-of-contract counterclaim, and (d) London Luxury's breach claim.  The jury rejected each one.  *Supra* 16.  The only tort damages awarded were for Small's

employment.  In the face of an unequivocal verdict by a unanimous jury, the contract should be reformed without delay.

### IV.    The District Court Correctly Awarded Prejudgment Interest

The district court's application of the prejudgment interest standard to the facts of the case is reviewed for abuse of discretion, *All-Ways Logistics, Inc. v. USA Truck, Inc.*, 583 F.3d 511, 518 (8th Cir. 2009), while the court's *authority* to award interest (not at issue here) is reviewed de novo, *Children's Broad. Corp. v. Walt Disney Co.*, 357 F.3d 860, 868-69 (8th Cir. 2004).  Whatever the standard of review, however, the award of prejudgment interest must stand.

"In Arkansas, prejudgment interest must be awarded if damages can be determined mathematically or without reliance on opinion or discretion."  *Ferrell v. W. Bend Mut. Ins. Co.*, 393 F.3d 786, 797 (8th Cir. 2005).  "That standard is met if a method exists for fixing the exact value of a case of action at the time of the occurrence of the event that gives rise to the cause of action."  *Reynolds Health Care Servs., Inc. v. HMNH, Inc.*, 217 S.W.3d 797, 807 (Ark. 2005).  "Where prejudgment interest may be collected at all, the injured party is always entitled to it as a matter of law."  *Id.*

Here, expert witness David Bones calculated expectation damages by applying basic "math."  Trial.Tr.2038:1-25.  Based on the evidence, if Walmart hadn't breached, London Luxury would have received $106 million in profit (72

58

million boxes at a profit of roughly $1.50 per box), but when Walmart breached, London Luxury had earned only $4.9 million. Trial.Tr.2042:22-2043:5. Bones subtracted those numbers to yield $101,218,680—the amount the jury awarded. Trial.Tr.2044:1-5, 2458:15.

The inputs to that math came from documentary evidence: London Luxury's "actual financial statements" and the agreements with Walmart and London Luxury's own supplier. Trial.Tr.2043:7-8, 2039:20-2040:10, 2042:5-17. Walmart did not call any damages expert or offer any alternative calculation.

Therefore, the damages were "ascertainable by mathematical computation," and "the evidence furnishe[d] data that ma[de] it possible to compute" the damages amount "without reliance on opinion or discretion." *Reynolds*, 217 S.W.3d at 807; *Ozarks Unlimited Res. Coop., Inc. v. Daniels*, 969 S.W.2d 169, 174 (Ark. 1998). This is not a case where the jury invented a damages number rather than adopt the formula from trial. *Dorsett v. Buffington*, 429 S.W.3d 225, 233 (Ark. 2013). Prejudgment interest was therefore required.

Walmart offers two counterarguments; neither has merit. Walmart first attacks the award on the ground the jury awarded expectation damages, which were supposedly based on speculative "assumptions" about London Luxury's costs of completion. WM.Br.57. That is incorrect. Bones looked at London Luxury's actual costs in its actual contracts with its actual suppliers and saw it there in black

and white: $6 per box.  In similar circumstances, the Arkansas Supreme Court held

prejudgment interest is required.  In *Advance Construction Co. v. Dunn*, 563

S.W.2d 888, 889-91 (Ark. 1978), the Court awarded interest where damages for

repudiation of construction contracts were calculated "by awarding [plaintiffs] the

full contract price minus any payments made and what it would have cost

[plaintiffs] to complete the construction contracts."  So too here.  If anything, when

Walmart repudiated, glove prices had fallen, and London Luxury could have

bought gloves for *even cheaper* than for the previous price negotiated with

factories.  Trial.Tr.1141:17-1144:04.

Walmart postulates that maybe London Luxury's factories might not have

wanted to fill Walmart's entire order, but the jury rejected that speculation in

awarding the entire damages requested.  That is dispositive, because where an early

contract termination "save[s] the plaintiff the expense of full performance" and the

amount saved "is a matter for the jury to determine," "interest is recoverable from

the date of the breach" "[i]n spite of this uncertainty."  *Loomis v. Loomis*, 221 Ark.

743, 746-47 (1953).  "[I]t is irrelevant to the recovery of prejudgment interest that

the [damages] amount is disputed."  *Bank of Mulberry v. Fireman's Fund Ins. Co.*,

720 F.2d 501, 504 (8th Cir. 1983).  Nevertheless, the jury's award was supported

by unrebutted *fact-witness* testimony that the factories could "help London Luxury

fulfill the *whole contract* with Walmart."  Trial.Tr.266:23-25.

This is a far cry from *Reesnes v. Reesnes*, 655 S.W.3d 722, 729-30 (Ark. Ct. App. 2022), where damages were based not on a simple calculation from undisputed evidence, but from the trial court's adoption of one of two competing methods for *valuing a business*—an extremely subjective endeavor.

Walmart's second argument contends, bizarrely, that, *if* London Luxury *had* relied on the June Letter at trial, "the jury *would have* faced competing narratives on damages," which *would have* required the jury to exercise discretion to award damages. WM.Br.58-59. As should be self-evident, hypothetical damages disputes about hypothetical claims that did not go to the jury are irrelevant. Walmart's cases are inapposite. In each, the jury considered competing damages theories for claims actually presented at trial.

## CONCLUSION

The Court should affirm.

Dated: September 8, 2025                  Respectfully Submitted,

                                                 */s/ Brendon DeMay*

Scott Richardson                          Brendon DeMay (*Counsel of Record*)
MCDANIEL WOLFF, PLLC                       Priyanka Timblo
1307 West 4th Street                      Ian Miller
Little Rock, AR 72201                     Brett Donaldson
501-954-8000                              HOLWELL SHUSTER &
scott@mcdanielwolff.com                     GOLDBERG LLP
                                          425 Lexington Avenue, 14th Fl.
                                          New York, NY 10017
                                          646-837-5151
                                          bdemay@hsgllp.com
                                          ptimblo@hsgllp.com
                                          imiller@hsgllp.com
                                          bdonaldson@hsgllp.com

         *Counsel for London Luxury LLC*

**CERTIFICATE OF COMPLIANCE**

1.      This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App.

P. 32(f), the brief contains 12971 words.

2.      This brief complies with the typeface requirements of Fed. R. App.

P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because the

brief has been prepared in a proportionally spaced, serif typeface using Microsoft

Word in 14-point Times New Roman.

3.      This brief complies with Local Rule 28A(h)(2) because the brief

has been scanned for viruses and is free of virus.


                                        */s/ Brendon DeMay*
                                        Brendon DeMay

**CERTIFICATE OF SERVICE**

I hereby certify that on September 8, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Brendon DeMay*
Brendon DeMay